DONALD L. U., JR.,                          )
                                            )
        Plaintiff,                   )
                                            )
    v.                                      )        No.  2:18 CV 53 JMB
                                            )
                                            )
ANDREW M. SAUL,[1]                          )
Commissioner of Social                      )
Social Security Administration,             )
                                            )
        Defendant.                   )

## MEMORANDUM AND ORDER

      This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.* ("the Act").  The Act authorizes judicial review of the final decision of the Social Security Administration denying Plaintiff Donald U.'s ("Plaintiff") application for disability benefits under Title II of the Social Security Act,  see 42 U.S.C. §§ 401 et seq. and supplemental security income under Title XVI, see 42 U.S.C. §§ 1381 et seq.  All matters are pending before the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

## I.  Procedural History

      On June 22, 2015, Plaintiff filed applications for disability benefits, arguing that his disability began on May 9, 2015, as a result of diabetes, back injury, arthritis, right shoulder pain,

---

[1] After the case was filed, a new Commissioner of Social Security was confirmed.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

blockage in artery of left leg, and immobility of hip. (Tr. 196, 269-75) On August 31, 2015, Plaintiff's claims were denied upon initial consideration. (Tr. 196-99) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at the hearing (with counsel) on February 14, 2017, and testified concerning the nature of his disability, his functional limitations, and his past work. (Tr. 143-65) The ALJ also heard testimony from Dan Zumalt, a vocational expert ("VE"). (Tr. 165-75, 383-87) The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education. (Id.) After taking Plaintiff's testimony, considering the VE's testimony, and reviewing the rest of the evidence of record, the ALJ issued a decision on July 19, 2017, finding that Plaintiff was not disabled, and therefore denying benefits. (Tr. 8-19)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration ("SSA"). (Tr. 1-7) On May 17, 2018, the Appeals Council denied review of Plaintiff's claims, making the July 19, 2017, decision of the ALJ the final decision of the Commissioner. Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court. See 42 U.S.C. § 405(g).

In his brief to this Court, Plaintiff raises two related issues. First, Plaintiff argues that the ALJ failed to give more weight to Dr. Samaritoni's opinions in the MSS as his treating doctor. Second, he argues that the ALJ's Residual Function Capacity ("RFC") determination is not supported by substantial evidence. The Commissioner filed a detailed brief in opposition. In his Reply brief, Plaintiff argues that the ALJ erred by finding he could perform other work at step 5 because the ALJ failed to support the RFC with medical opinions.

As explained below, the Court has considered the entire record in this matter. Because

the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.  **Medical Records**

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from May 12, 2014, through September 6, 2017.[2]  The Court has considered the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.  **Hannibal Free Clinic** (433-34, 435-54, 456-57, 459-78)

Between May 12, 2014, and October 10, 2016, a number of doctors on staff at Hannibal Free Clinic treated Plaintiff.

During treatment on May 12, 2014, for diabetes mellitus, Dr. Adam Samaritoni noted that Plaintiff was not taking his prescribed medications.  Plaintiff reported no chief complaint except follow-up treatment.   Plaintiff returned on June 27, 2014, and Dr. Samaritoni continued Plaintiff's medication regimen.  On August 29, 2014, Plaintiff returned for a routine follow up and reported no chief complaint.

On January 30, 2015, Plaintiff returned for follow-up treatment and medication refills. Plaintiff admitted that he had not been taking his prescribed medications for two to three weeks and reported no chief compliant.

During treatment on May 30, 2015, Dr. Lawrence Nichols completed a musculoskeletal

---

[2] Plaintiff submitted additional medical evidence to the Appeals Council which was not before the ALJ.  Specifically, the Appeals Council considered treatment notes dated January 9 to June 27, 2017, because these notes related to matters occurring before the ALJ's decision in this case. The Appeals Council found that "this evidence does not show a reasonable probability that it would change the outcome of this decision." (Tr. 2)  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence on the record as a whole.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.  The Appeals Council did not consider treatment notes dated July 22 to September 6, 2017, because those notes related to matters occurring after the ALJ's decision.

examination noting as follows: "Literally, when I asked him to move his arm, his whole body would tremor and he would act as though he could not lift his arm, he could not even lift his arm up to shake my hand, but I was passively able to move his arm through pretty much a full range of motion. Of course, he did lots of facial grimacing, reporting severe pain." (Tr. 433) Dr. Nichols "explained to [Plaintiff] if the symptoms are that severe and he truly cannot move his arm, he may have something significant going on within the vertebral column, with the spinal cord, I explained to him that things like diskitis can be present, and recommended that they go immediately over to the emergency room for further evaluation including possible MRI of that area." (Tr. 457) Dr. Nichols commented that he thought Plaintiff was malingering and upset that he did not prescribe narcotics.

In follow-up treatment on July 13, 2015 with Dr. Samaritoni, Plaintiff reported having pain in his feet. On October 12, 2015, Plaintiff reported not taking his medications and being unable to do much of anything because of severe back and right shoulder pain. In follow-up visit on January 11, 2016, Plaintiff reported having palpitations. On April 11, 2016, Plaintiff returned for a routine visit and Dr. Samaritoni continued his medication regimen. Plaintiff returned on July 11and October 10, 2016, for medication refills, and Plaintiff reported having no chief complaint.

On January 9, 2017, Dr. Samaritoni completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) ("MSS") in a checklist format and answered questions regarding Plaintiff's impairments at the behest of counsel. Dr. Samaritoni opined that Plaintiff could lift less than ten pounds occasionally; sit less than two hours; stand less than two hours; and walk less than two hours in an eight-hour workday. Dr. Samaritoni indicated that Plaintiff could sit and/or stand for ten minutes before changing position, and he must walk around every

fifteen to twenty minutes for five minutes in an eight-hour workday. Next, Dr. Samaritoni indicated that Plaintiff would have to lie down every hour during the workday. In support of these limitations, Dr. Samaritoni listed Plaintiff's medical conditions including frozen shoulder, cervical radiculopathy, and diabetic peripheral neuropathy. Dr. Samaritoni further opined that Plaintiff can never stoop, crouch, or climb stairs or ladders. As to his manipulative functions, Dr. Samaritoni opined that Plaintiff can never reach, handle, finger, or push/pull. Dr. Samaritoni further noted that Plaintiff "has very little mobility because of his conditions." (Tr. 453) Next, Dr. Samaritoni noted that Plaintiff would miss more than four days of work each month; he would be off task 25% or more each workday; and he would need to take an unscheduled break every sixty to ninety minutes for thirty minutes due to his muscle weakness and pain.

B.    **Hannibal Regional Hospital** (Tr.49-58, 109-14, 135-42, 396-430)

On May 30, 2015, Plaintiff presented in the emergency room at Hannibal Regional Hospital, complaining of severe back pain and numbness and difficulty moving his right arm. Plaintiff reported not taking any medications and being a daily smoker. Plaintiff reported being hit in the back a month earlier and experiencing progressive pain since that time. Examination showed normal strength and his strength 5/5 to proximal and distal muscle groups of the upper and lower extremities bilaterally. An MRI of his thoracic spine showed degenerative disk disease and spondylosis without evidence of acute fracture or subluxation. In the diagnostic interpretation, Dr. Phillip Rohde opined that Plaintiff had "no weakness that would be concerned for radiculopathy as dermatomal distribution not consistent with location of pain" and diagnosed Plaintiff with back contusion. (Tr. 406) Dr. Rohde prescribed muscle relaxants and provided a physical therapy regimen of back exercises.

The January 9, 2017, MRI of Plaintiff's cervical spine showed degenerative changes in

disc protrusion.

On July 21, 2017, Plaintiff received follow-up treatment in the emergency room at Hannibal Regional Hospital for an infection after femoral bypass surgery. Plaintiff reported having no back, neck, or limb pain. The treating doctor transferred Plaintiff to University of Missouri Health Care for treatment of his acute cellulitis.

### C. **Midwest Orthopedic Specialists** (Tr. 105-08)

On April 24, 2017, Dr. Curtis Burton treated Plaintiff's chronic right shoulder pain. Dr. Burton noted that an x-ray showed no specific abnormality and diagnosed Plaintiff with chronic adhesive capsulitis. Plaintiff reported smoking one to two packages of cigarettes a day. Examination showed no significant tenderness with palpation of his neck and limited external rotation of his right shoulder. Dr. Burton told Plaintiff to quit smoking.

### D. **Hannibal Regional Medical Group** (Tr. 115-34)

On January 9, 2017, Plaintiff established care with Dr. Samaritoni with a chief complaint of diabetes. In follow-up treatment on March 21, 2017, Plaintiff reported not taking Lantus for several months as prescribed. Plaintiff experienced pain when Dr. Samaritoni examined his right shoulder. On March 29, 2017, Plaintiff presented for a follow-up appointment, and Dr. Shaybu Harruna strongly encouraged Plaintiff to stop smoking. Examination showed no joint pain or stiffness.

On April 20, 2017, Plaintiff returned for a one month follow up for his diabetes type 2 and although he was supposed to start Lyrica, he had not picked up the medication from the pharmacy. On April 24, 2017, Dr. Luvell Glanton treated Plaintiff's pain. Plaintiff reported his pain interfering with his driving, walking, bathing, vacuuming, leisure activities, work duties, and cooking. Musculoskeletal examination of his upper and lower extremity was normal. Dr.

Glanton recommended a cervical epidural injection.

  E. **University of Missouri Health Care** (Tr. 29-40, 61-104)

  On May 1, 2017, Plaintiff had elective bilateral leg angiogram and right femoral sheath placement to treat his severe peripheral vascular disease. Plaintiff returned on June 26, 2017, complaining of left leg and foot pain. Dr. Paul Humphrey performed a left femoral bypass. Examination showed good range of motion of all major joints.

  On July 22, 2017, Plaintiff received follow-up treatment at the University of Missouri Health Care for an infection. Plaintiff reported smoking a pack of cigarettes daily and a history of hypertension and diabetes mellitus. Musculoskeletal examination showed Plaintiff had a normal range of motion of all joints and normal strength and no pain. The treating doctor noted that Plaintiff had no apparent distress.

  F. **Columbia Surgical Associates** (Tr. 42-48)

  On September 6, 2017, Plaintiff returned for treatment at Health Care Columbia Surgical Associates. Examination showed Plaintiff was able to move all of his extremities without difficulty.

  G. **Sankpill Chiropractic – Dr. Stephen Sankpill** (Tr. 391-95)

  On May 12, 2015, Plaintiff received treatment for arm and back pain. Plaintiff listed Riney Walden as his employer. Plaintiff reported moderate exercise and his work activity included standing and light labor. Examination showed Plaintiff's finger flexion strength to be a five on his left hand and a four on his right hand.

**III.** **Forms Completed by Plaintiff**

  In a Work History Report, Plaintiff noted that he had to stop "all physical job activities" due to his increased pain. (Tr. 334-41) Plaintiff reported working from March 2004 to May

2005 as a cab driver; from September 2006 to November 2008 as an operator at a heater manufacturer; from August 2011 to December 2013 as a telephone solicitor; from September to November 2014 as a worker on a farm; and from December 2014 to May 2015 as a direct care staff worker.

In a Function Report-Adult, Plaintiff stated that he could not sit or stand for extended periods of time, he could not walk any distance, and he could not lift or hold any weight. Plaintiff reported that his daily routine included feeding and grooming animals, doing laundry and other household chores, preparing meals, and helping care for his wife and their children by cooking and cleaning. Plaintiff also went grocery shopping biweekly for one to two hours at a time. His hobbies include playing video games, watching movies, and reading books. Plaintiff reported using a cane daily. (Tr. 342-48)

## IV.    The Hearing Before the ALJ

The ALJ conducted a hearing on February 14, 2017. Plaintiff was present with an attorney and testified at the hearing. The VE also testified at the hearing. (Tr. 143-75)

### A.    Plaintiff's Testimony

Plaintiff began his testimony by noting that he lives with his wife and two children. (Tr. 147) Plaintiff finished one year of college. (Tr. 148) Plaintiff testified that he can drive but only when his wife is not available. (Tr. 156) His wife does all the shopping, and he washes the dishes and sometimes does the laundry. Plaintiff testified that he has problems shaving and showering. (Tr. 157)

Plaintiff testified that he is a twenty-year diabetic, and his condition has caused nerve problems in his feet and his hands. (Tr. 148-49) Plaintiff explained that elevating his feet alleviates the pain. (Tr. 149) When his blood sugar level is high, Plaintiff experiences vision

blurriness.  (Tr. 153)  Plaintiff testified that he has problems gripping things.  (Tr. 150)  Plaintiff

testified that his right shoulder locks up so he cannot reach out and lift up anything.  Plaintiff

indicated that he had worked as a driver with this condition for a period of time, and he had not

worked since leaving that job.  (Tr. 151)  Plaintiff also experiences neck pain.  (Tr. 152)  Plaintiff

testified that his blocked artery in his left leg causes constant numbness from his hip to his toes,

and he takes over the counter medications.  (Tr. 154)  Plaintiff testified that he has Barrett's

esophagitis causing constant indigestion.  (Tr. 155)

Plaintiff acknowledged that he had been sitting for twenty-five minutes during the

hearing but that he was experiencing pain.  Plaintiff testified that he can stand for five to ten

minutes and walk one hundred feet.  (Tr. 158)  Plaintiff indicated that he can lift a pound but he

cannot bend, squat, or stoop.  (Tr. 159)  Plaintiff testified that he has been using a cane for eight

months.  (Tr. 161)

Plaintiff testified that Dr. Samaritoni treated him at the Hannibal Free Clinic for five

years.  (Tr. 173)  Plaintiff indicated that he did not have insurance until last month.  (Tr. 174)

**B.      The VE's Testimony**

The VE identified Plaintiff's past work as a product assembler, a taxi driver, a healthcare

driver, a livestock farming worker, and a telephone solicitor.  (Tr. 167-68)

The ALJ asked the VE a series of hypothetical questions to determine whether someone

Plaintiff's age, education, work experience, and specific functional limitations would be able to

find a job in the local or national economy.  (Tr. 168)  First, the ALJ asked  the VE to assume a

hypothetical individual limited to light work with the ability to occasionally climb ladders, ropes,

or scaffolds, frequently climb ramps and stairs, balance, stoop, kneel crouch and crawl;

occasionally work at unprotected heights and around moving mechanical parts; and occasionally

operate a motor vehicle as a job duty would preclude employment. The VE responded that such

a hypothetical person would be able to perform Plaintiff's past work as a product assembler. (Tr.

168) The VE also indicated such individual could also perform the light job duties of a copy

messenger and a ticketer. (Tr. 169) The ALJ next asked if the individual could only

occasionally reach overhead and in all directions with his dominant, right arm; never climb

ladders, ropes, or scaffolds; and occasionally crawl, could the individual perform the work of the

product assembler job. The VE responded such individual could perform the product assembler

job, noting that the requirement of reaching overhead was not necessary to perform that job. (Tr.

170) The VE indicated that the individual would be able perform all the other jobs limited to the

light exertional level because such jobs do not require overhead work. The ALJ added another

limitation requiring the individual to use a cane. (Tr. 170) The VE indicated that the individual

would be able to perform the duties of the sedentary and light exertional jobs except for the

product assembler job. (Tr. 171)

Next, the ALJ asked whether reducing the exertional level to sedentary would preclude

employment. (Tr. 169) The VE indicated that such hypothetical person would be able to

perform the job duties of a patcher, touch up screener, and printed circuit board assembler. (Tr.

169)

Counsel asked if the individual could never reach, handle, finger, push, or pull, would the

individual be able to perform any of the jobs he listed. The VE indicated that such limitation

would preclude the individual from working the jobs he discussed. (Tr. 171) The VE testified

that if the individual required a thirty minute break every sixty to ninety minutes, such limitation

would preclude competitive employment. (Tr. 172) Next the VE indicated that absences in

excess of once a month would result in termination.

## V.  The ALJ's Decision

In a decision dated July 19, 2017, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 12-19)  The ALJ determined that Plaintiff had severe impairments of degenerative disk disease with spondylosis of the thoracic spine, diabetes mellitus, and peripheral artery disease.  (Tr. 13-14)  The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform a wide range of light work with the following modifications:  (1) he can lift and/or carry and push and/or pull up to ten pounds frequently and twenty pounds occasionally; (2) he can sit for up to six hours in an eight-hour workday and stand and/or walk for up to six hours in an eight-hour workday; (3) he can perform occasional reaching overhead on the right; (4) he can also reach occasionally on the right for all other reaching; (5) he can climb ramps and stairs frequently but never climb ladders, ropes, or scaffolds; (6) he can frequently balance, stoop, kneel, and crouch and occasionally crawl; and (7) he can occasionally work at unprotected heights with moving mechanical parts and operate a motor vehicle.  (Tr. 14)

Despite having found Plaintiff capable of performing his past relevant work such as a product assembler as generally performed at step 4 of the analysis, the ALJ proceeded to step 5 and made an alternative finding, based on VE testimony, that there are other jobs existing in the national economy he was able to perform such as a patcher, touch up screener, and printed circuit board assembler.  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.  (Tr. 17)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VI.  Standard of Review and Legal Framework

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …."  <u>Baker v.</u>

Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§

423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [his]

physical or mental impairment or impairments are of such severity that [he] is not only unable to

do [her] previous work but cannot, considering [his] age, education and work experience, engage

in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ

follows 'the familiar five-step process' to determine whether an individual is disabled…. The

ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3)

[his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past

relevant work; and if not, (5) whether [he] could perform any other kind of work."  Martise v.

Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th

Cir. 2010)).  See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's

disability determination is intended to be narrow and that courts should "defer heavily to the

findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734,

738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The

ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record

as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less

than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

**VII.** **Analysis of Issue Presented**

In his brief to this Court, Plaintiff challenges the weight the ALJ accorded to Dr. Samaritoni's opinions in the MSS as his treating doctor. Plaintiff also challenges the ALJ's RFC determination as not being supported by substantial evidence.

At one point in his brief, Plaintiff suggests that he did not seek medical treatment due to lack of insurance. In this matter, however, the record does not reflect that Plaintiff was ever denied medical treatment due to lack of insurance. See Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (finding it significant that the record did not show claimant was denied treatment or not provided with alternative, less expensive treatments when needed). Indeed, the record reflects that Plaintiff sought and received treatment at the Hannibal Free Clinic and during the hearing, Plaintiff testified he had received treatment by Dr. Samaritoni for five years at the Hannibal Free Clinic. (Tr. 173)

**A.** **Dr. Samaritoni**

Plaintiff challenges the weight the ALJ accorded to Dr. Samaritoni's opinions in the MSS as his treating doctor without offering sufficient reason. The Court disagrees with this characterization of the ALJ's decision.

In the MSS, Dr. Samaritoni opined that Plaintiff could lift less than ten pounds occasionally; sit less than two hours; stand less than two hours; and walk less than two hours in an eight-hour work day. Dr. Samaritoni also indicated that Plaintiff could sit and/or stand for ten minutes before changing position, and he must walk around every fifteen to twenty minutes for five minutes in an eight-hour workday. Next, Dr. Samaritoni opined that Plaintiff would have to lie down every hour during the workday. In support of these limitations, Dr. Samaritoni listed Plaintiff's medical conditions including frozen shoulder, cervical radiculopathy, and diabetic

peripheral neuropathy. Dr. Samaritoni further noted that Plaintiff "has very little mobility because of his conditions." (Tr. 453) Next, Dr. Samaritoni noted that Plaintiff will miss more than four days of work each month; he will be off task 25% or more each workday; and he will need to take an unscheduled break every sixty to ninety minutes for thirty minutes due to his muscle weakness and pain.

The ALJ afforded Dr. Samaritoni's opinions in the MSS little weight because the severity of his limitations was not consistent with the objective evidence of record, Plaintiff's longitudinal medical history, observations by treating and non-treating sources, non-examining medical source opinions, and daily activities. The ALJ found that the MSS indicates that Plaintiff "was limited to an exceptionally restricted range of less than sedentary work consistent with total disability." (Tr. 16) The ALJ outlined the treatment records from Dr. Samaritoni and other treating and examining doctors which did not support the marked functional limitations in Dr. Samaritoni's MSS and showed routinely normal or otherwise objective testing results.

Dr. Samaritoni treated Plaintiff a total of eleven times between May 12, 2014 and October 10, 2016, before completing the MSS. See 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treated source has treated [a claimant] and the more times [a claimant] has been seen by a treating source, the more weight [the ALJ] will give to the source's medical opinion."). "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'" Id. (quoting Prosch v. Apfel, 201 F.3d

1010, 1013 (8th Cir. 2000)). "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions." Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted). "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so." Prosch, 201 F.3d at 1013 (citing 20 C.F.R. § 404.1527(d)(2)).

A review of the MSS shows that it was based on no objective testing, such as range of motion testing. (Tr. 451-54) In support of the limitations set forth in the MSS, Dr. Samaritoni cited to Plaintiff's frozen shoulder, cervical radiculopathy, and diabetic peripheral neuropathy.[3] The ALJ accorded Dr. Samaritoni's opinion only little weight as the MSS was inconsistent with the objective medical record, including Dr. Samaritoni's own treating notes. See McCoy v. Astrue, 648 F.3d 605, 616-17 (8th Cir. 2011) (ALJ may reject a medical opinion if it is "inconsistent with the record as a whole" or "based, at least in part, on [the claimant's] self-reported symptoms" where the claimant is deemed not credible). Significantly, as reflected in his own treatment records, Dr. Samaritoni never imposed any of the physical or functional limitations set out in his MSS. See Toland v. Colvin, 761 F.3d 931, 935-36 (8th Cir. 2014) (finding that "ALJ had sufficient reason to discount" treating provider's opinion where he "included limitations in the MSS that are not reflected in any treatment notes or medical records") (quotation marks and citation omitted); Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (affirming ALJ's rejection of treating physician's opinions about plaintiff's exertional limitations that "[were] not reflected in any treatment notes or medical records.").

---

[3] The undersigned notes that, in Dr. Samaritoni's treatment notes, there is no mention of the physical limitations of frozen shoulder and cervical radiculopathy. See Toland v. Colvin, 761 F.3d 931, 935-36 (8th Cir. 2014) (finding that "ALJ had sufficient reason to discount" treating provider's opinion where he "included limitations in the MSS that are not reflected in any treatment notes or medical records") (quotation marks and citation omitted).

The Court finds that the ALJ gave proper weight to the opinions of Dr. Samaritoni set forth in the MSS.[4]  See Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement" that include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [plaintiff's] medical records."); Anderson, 696 F.3d at 793-94 (holding that "a conclusory checkbox form has little evidentiary value when it "cites no medical evidence, and provides little to no elaboration" and that it is proper for ALJ to discount a provider statement that "contained limitations that 'stand alone,' did not exist in the physician's treating notes, and were not corroborated through objective medical testing").

In assigning little weight to Dr. Samaritoni's MSS, the ALJ also concluded that the MSS was inconsistent with the objective medical evidence.  Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir. 1996) (treating source's opinions assigned less weight when the "opinions have largely been inconsistent and are not fully supported by the objective medical evidence).  "[O]ther evidence in the record also supports the ALJ's decision not to accord [Dr. Samaritoni's] opinion controlling weight."  Reece, 834 F.3d  at 910 (finding that "Commissioner gave good reasons for discounting" treating doctor's opinion where his findings were, inter alia, "highly inconsistent with the objective medical evidence in the record" and "other evidence in the record, such as [plaintiff]'s activities of daily living and [another doctor's] findings, did not support [the treating doctor]'s opinion and supported a much higher level of functioning than would be expected from someone with the limitations described in the [treating doctor]'s Medical Source Statement.").

[4] The undersigned also notes that Dr. Samaritoni completed the MSS three months after last treating Plaintiff, and the MSS was only a series of check marks to assess the functional limitations of Plaintiff with little or no explanation of the finding, no medical evidence or objective testing in support.  Further, the MSS appears to have been procured by, and submitted to, Plaintiff's counsel.

Specifically, the ALJ noted that during treatment, physical examinations showed Plaintiff's strength was normal at 5/5 to proximal and distal muscle groups of the upper and lower extremities bilaterally and his cranial nerve functioning was intact.

Overall, the medical evidence shows that Plaintiff has received routine and conservative medical treatment limited to office visits and medication management, and his providers have recommended such care. See Robinson v. Sullivan, 956 F.2d 936, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain); Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015). In fact, the evidence also shows Plaintiff's symptoms improved with conservative medical treatment. The objective testing revealed no functional limitations.

The undersigned also finds that the limitations listed in Dr. Samaritoni's MSS were never mentioned in any physicians' treatment records or supported by any objective testing or reasoning. See Anderson, 696 F.3d at 793-94 (holding proper for an ALJ to discount a provider statement that "contained limitations that 'stand alone,' did not exist in the physician's treating notes, and were not corroborated through objective medical testing").

The ALJ sufficiently explained his reasons for giving Dr. Samaritoni's marked functional limitations in the MSS little weight as inconsistencies between the objective medical evidence and his own treatment records. Viewing the ALJ's opinion in light of the record as a whole, substantial evidence supports the ALJ's decision to assign little weight to Dr. Samaritoni's opinions in the MSS. See Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding no error in decision to discount "cursory checklist statement" that "include[d] significant impairments and limitations that are absent from [provider's] treatment notes and [claimant's] medical records"); Prosch, 201 F.3d at 1013 (internal inconsistency and conflict with other evidence on the record constitute good reasons to assign lesser weight to a treating physician's opinion).

**B.** **Residual Functional Capacity**

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because the ALJ made serious errors in assessing the evidence. Notably, Plaintiff does no identify which, if any, specific RFC finding and/or limitation is not supported by the record. The burden to establish a plaintiff's RFC rests with the plaintiff. Pearsall, 274 F.3d at 1217. An ALJ is not required to disprove every possible impairment. McCoy, 648 F.3d at 612. By arguing generally that the limitations set out in the RFC are not supported by the record, without specifying what additional limitations are warranted by the evidence, Plaintiff essentially asks the Court to reweigh the evidence or review the factual record *de novo*, which the undersigned cannot do. See Smith v. Colvin, 756 F.3d 621, 626 (8th Cir. 2014). Based on the administrative record and the ALJ's thorough summary of the record, the undersigned cannot say that the ALJ overlooked any of Plaintiff's limitations when assessing his RFC.

In his Reply brief, Plaintiff argues that the ALJ failed to support her physical RFC determination with some medical evidence at step 5, citing Weddle v. Berryhill, 2018 WL 6064867 (E.D. Mo. Nov. 20. 2018) (finding the record is underdeveloped because there is no firsthand medical evidence for the step 5 analysis.).

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations. See 20 C.F.R. § 404.1545. "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)). An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir.

2010); see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment."). The ALJ must explain her assessment of the RFC with specific references to the record. SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion). Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016). Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.

According limited weight to opinion evidence does not necessarily render the record devoid of substantial evidence upon which an ALJ can base his decision. The limitation of opinion evidence does not undermine an ALJ's RFC determination where other medical evidence in the record supports the finding. See Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007); see also Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (lack of opinion evidence not fatal to RFC determination where ALJ properly considered available medical and testimonial evidence.); Sampson v. Apfel, 165 F.3d 616 (8th Cir. 1999) (although ALJ discounted the only opinion evidence of record, a review of the entirety of the medical record provided substantial evidence on the record as a whole to support the ALJ's decision.).

A review of the record shows that there was substantial medical and other evidence upon which the ALJ could base her decision, even with the little weight accorded to his treating doctor's MSS. This evidence includes the contemporaneous treatment notes made by a number of providers that recorded their findings of normal physical findings, full muscle strength in his

upper and lower extremities, steady and intact gait, no difficulty bearing weight, no neck tenderness, and unremarkable x-rays and some limitation exacerbation related to Plaintiff's failure to take prescribed medication.  See, e.g., Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) (record showed medication to effectively control mental symptoms and that plaintiff was not significantly impaired despite medication).  The ALJ also noted Plaintiff's work history as consistently not being at or near the substantial gainful activity level prior to his alleged disability onset date.  See Mabry v. Colvin, 815 F.3d 386, 392 (8th Cir. 2016) (poor work history may show a claimant's lack of motivation to work); Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability").

The ALJ determined Plaintiff's physical RFC based on all of the relevant, credible evidence in the record including:  (1) the medical records; (2) observations of treating physicians[5] and others; and (3) Plaintiff's own description of his limitations.  See McKinney v. Apfel, 228 F.3d 860, 863(8th Cir. 2000); see also Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir. 2012) ("Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the RFC."); Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) ("The RFC is a function-by-function assessment of an individual's ability  to do work-related activities based upon all of the relevant evidence.").  "Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, a claimant's residual functional capacity is a medical question."  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).  In this case, there was "some medical evidence"

---

[5] "'[A]n ALJ may discount a claimant's allegations if there is evidence that a claimant was a malinger or was exaggerating symptoms for financial gain.'"  Davidson v. Astrue, 578 F.3d 838, 844 (8th Cir. 2009) (quoting O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003)).

in the record from treating medical professionals as to Plaintiff's "ability to function in the workplace" to support the ALJ's RFC determination. Cox, 495 F.3d at 618. While the medical evidence discussed by the ALJ did not explicitly attest to Plaintiff's employability, the evidence does allow for an understanding of how Plaintiff's limitations function in a work environment.

Based on the objective medical evidence and Plaintiff's testimony and after evaluating Plaintiff's subjective symptoms, the ALJ determined that Plaintiff retained the RFC to perform a wide range of light work[6] with additional enumerated limitations/restrictions. During the hearing, the ALJ observed that Plaintiff "did not exhibit debilitating symptoms while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of functioning on a day-to-day basis, the apparent lack of debilitating symptoms during the hearing is given some slight weight … in reaching a conclusion regarding the claimant's alleged symptoms and maximum residual functional capacity." (Tr. 17) While an ALJ cannot accept or reject subjective complaints solely on the basis of personal observations, an ALJ's observations of a plaintiff's appearance and demeanor during the hearing is a consideration. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (After observing the claimant during her testimony at the hearing and considering the objective medical evidence, the ALJ found the claimant was not fully credible and could perform light work).

As detailed by the ALJ and throughout her decision, there was sufficient other medical evidence of record supporting the determination that Plaintiff had the RFC to perform a wide range of light work with additional restrictions. Plaintiff cites to no objective medical evidence

---

[6] "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing 20 C.F.R. § 404.1567(b)).

to demonstrate that his impairments caused any limitations to his work-related activities more serious that the ALJ stated in her RFC assessment. The ALJ found that Plaintiff is capable of performing his past relevant work as a product assembler as generally performed. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (explaining that plaintiff has burden of establishing he cannot perform past relevant work.); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998) ("the claimant bears the initial burden to show that she is unable to perform her past relevant work."). Since Plaintiff did not challenge the hypothetical question to the VE at step 4, based on the VE's testimony, substantial evidence supports the ALJ's decision that Plaintiff can return to his past relevant work. Accordingly, it cannot be said that the ALJ's decision is not supported by substantial evidence on the record as a whole.

Plaintiff also claims that the ALJ erred at step 5 of the sequential analysis by failing to support his RFC with medical opinions when determining that Plaintiff could perform such work. Assuming arguendo that the ALJ did commit this error at step 5, the ALJ had already made a finding at step 4 that Plaintiff could perform his past relevant work. Alternative findings at step 4 and step 5 are permissible and an "ALJ may properly deny benefits at more than one step of the sequential analysis." Barton v. Apfel, 187 F.3d 640, 1999 WL 314127, at *2 (8th Cir. 1999) (unpublished opinion); see also Julian v. Colvin, 2015 WL 1257790 (E.D. Mo. Mar. 18, 2015) (holding alternative findings are appropriate). Such findings are not only permissible, but in fact desirable, inasmuch as they conserve valuable agency and judicial resources. See Murrell v. Shalala, 43 F.3d 1388, 1389 (10th Cir. 1994) (stating that "[w]e thus not only specifically reject plaintiff's objection to the ALJ's alternative disposition here, but expressly reaffirm our favorable view of such dispositions generally.").

Here, the ALJ could have stopped at step 4, having determined that Plaintiff could

perform his past relevant work as a product assembler. Although not required to proceed to step 5, the ALJ did so and found, in the alternative, that Plaintiff could perform other work, based on VE testimony, such as a copy messenger and a ticketer. The ALJ's step 5 analysis cannot have prejudiced Plaintiff and is no basis for reversal as Plaintiff failed to demonstrate reversible error in the ALJ's step 4 determination that Plaintiff could perform his past relevant work, the ALJ's subsequent step 5 analysis is unnecessary to a disability finding. See Stumon v. Colvin, 2014 WL 7049287, at *6 (W.D. Mo. Dec. 11, 2014). To the extent the ALJ committed any error claimed by Plaintiff at step 5 of the sequential analysis, such error was harmless inasmuch as the ALJ's finding at step 4 that Plaintiff could perform his past relevant work was supported by substantial evidence. Accordingly, substantial evidence on the record as a whole supports the ALJ's finding at step 4 so any challenged error at step 5 of the analysis is therefore harmless and does not require remand. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (declining to remand for alleged error in opinion when error had no bearing on the outcome).

Because the ALJ based her RFC assessment upon review of all the credible, relevant evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003).

**VIII.  Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion. Id. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would

have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of September, 2019.